*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 31, 2020

**BY ECF**

The Honorable Alvin K. Hellerstein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Eugene Castelle*, **S7 18 Cr. 15 (AKH)**

Dear Judge Hellerstein:

      The Government respectfully submits this letter in opposition to defendant Eugene Castelle's motion for bail pending appeal. The defendant fails to meet his burden to demonstrate entitlement to release: his appeal does not raise a substantial question of law or fact likely to result in reversal or a new trial as to all counts of conviction, and in any event he would pose a substantial danger to the safety of the community if released. To the extent the motion is based on the COVID-19 pandemic, his release is similarly unwarranted—the crisis has no bearing on the standard for bail pending appeal and does not justify releasing the defendant. Accordingly, the defendant's motion should be denied.

**I. BACKGROUND**

      On May 31, 2019, the defendant was convicted after trial before this Court of one count of running an illegal gambling business, in violation of 18 U.S.C. § 1951, and one count of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). The evidence at trial established that the defendant is a longtime active soldier in the Luchese Crime Family of La Cosa Nostra. After his release from prison in 2008 following a previous conviction for racketeering conspiracy with the Luchese Crime Family, rather than lead a law-abiding life reflective of rehabilitation, the defendant immediately returned to the Luchese Crime Family. From approximately 2012 to 2018, he committed a number of different criminal acts of racketeering in furtherance of that enterprise, including illegal gambling, extortion, and wire fraud. The defendant used express and implied threats of violence in order extract money from his victims, all of which were backed by the reputation and resources of the Luchese Crime Family. (*See* Presentence Report ("PSR") ¶ 52). A brief summary of the evidence presented at trial and recognized by this Court at sentencing is as follows:

      <u>Illegal Gambling Business:</u> From 2012 to 2016, the defendant occupied the senior position in a large sports gambling business established by a bookmaker named Anthony Grecco. Although Grecco bankrolled the operation and ran it on a day-to-day basis, the defendant gave orders to Grecco. Because the defendant was a made member of the Mafia, Grecco had to obey those orders.

The defendant also provided protection to the business and instilled the fear of violence necessary to collect debts from bettors. The defendant took 25% of the business's profits on a weekly basis when the business earned a profit, estimated at $25,000 to $30,000 per year. But the defendant did not have to share in 25% of the losses during weeks when the business lost money.  (PSR ¶ 53).

Extortion of Anthony Grecco:  The defendant first joined the gambling business when the bookmaker, Anthony Grecco, asked him for assistance with another member of the Mafia, who was extorting 50% of Grecco's profits.  The defendant used his own superior position in the Mafia to displace the other mobster, for which he extracted $15,000 and a 25% share of Grecco's future profits.  The defendant then continued to extort Grecco on an ongoing basis.  Specifically, the defendant induced Grecco to take out a $40,000 loan on the defendant's behalf and then used threats of violence to force Grecco to assume responsibility for repaying the loan. The defendant also later shifted his payments from Grecco from a weekly percentage to a flat, annual $10,000 tribute payment every Christmas, in exchange for protection.  The losses sustained by Grecco through the defendant's extortion are estimated to be in excess of $95,000 in total.  (PSR ¶ 54).

No-Show Job Wire Fraud:  The defendant engaged in a wire fraud scheme in which he had a "no-show job" as a carpenter at a construction site. The defendant almost never went to the job, despite subcontracting company timesheets submitted to the general contractor which reflected that the defendant worked at the job site on a full-time basis eight hours per day, five days per week, for approximately one year.  Among other things, the defendant was recorded on a wiretap joking with a co-conspirator about the no-show job. The defendant received in excess of $80,000 in income as a result of this fraudulent scheme. (PSR ¶ 56).

On October 17, 2019, this Court sentenced the defendant to an above-Guidelines term of imprisonment of 77 months—60 months on Count One, and 77 months on Count Three, to run concurrently—to be followed by three years' supervised release, a $100,000 fine, and forfeiture of $188,955 in criminal proceeds.  (Dkt. 659).  The defendant has been in custody since this Court remanded him on June 19, 2019 following the jury's verdict.

## II.  LEGAL STANDARD

A court "shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment" be detained pending appeal unless it finds (1) "by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community if released," and (2) "that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—(i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process."  18 U.S.C. § 3143(b).  The defendant bears this substantial burden of proof.  Fed. R. Crim. P. 46(c).  This provision reflects Congress's view that "[o]nce a person has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even to permit it in the absence of exceptional circumstances."  *United States v. Miller*, 753 F.2d 19, 22 (3d Cir. 1985) (quoting H.R. Rep. No. 907, 91st Cong., 2d Sess. 186-87 (1970)).  In short, there is a "presumption in favor of detention" pending appeal.  *United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004).

Moreover, where, as here, a defendant stands convicted of multiple counts, he bears the burden of demonstrating a "substantial question of law or fact" likely to result in reversal or a new trial on each of the counts of conviction. *See Morison v. United States*, 486 U.S. 1306 (1988) (Rehnquist, C.J., in chambers); *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985).

### III. THE DEFENDANT WOULD POSE A SUBSTANTIAL DANGER TO THE SAFETY OF THE COMMUNITY IF RELEASED

First, bail pending appeal is foreclosed because the defendant would pose a substantial danger to the safety of the community if released. The defendant bears the burden of proving by clear and convincing evidence that he would not pose a danger, and he cannot meet that burden—as this Court has already concluded in ordering the defendant remanded after trial pending sentencing.

The defendant is a long-time made member of the Luchese Crime Family, a criminal organization with which the defendant engaged in numerous criminal acts including extortions, frauds, and running illegal gambling businesses. The defendant was more than merely a passive member of the Mafia; he was an active criminal over a period of at least six years in this case. His conduct demonstrates the way in which organized crime members enrich themselves by targeting vulnerable businesses and individuals, and use the fear of violence and economic harm to accomplish their unlawful goals. In total, the defendant extracted hundreds of thousands of dollars from those around him through explicit and implicit threats of violence and economic harm, as described above. For example, in an August 24, 2012 recorded phone call, bookmaker Anthony Grecco recounted a meeting in a diner with his former partner, "Joey," to negotiate a gambling business-related debt that the defendant attended. During the meeting, the defendant got angry, "picked up the . . . glass sugar shaker," and threatened to "crack [Joey] over the head every time" Joey gave an unsatisfactory response about the disputed debt. (GX 111; *see* Trial Tr. 297:9–299:4). Similarly, phone calls introduced at trial established that the defendant received $40,000 plus 25% of the gambling business's profits as compensation for having "grab[bed]" Grecco's previous business partner and scaring him away. (*See, e.g.*, GX 126).

La Cosa Nostra continues to pose a substantial threat to our communities and has no place in a civilized society. The structured and long-term, sustained nature of the defendant's criminal activity with the Mafia poses an unusually serious risk of danger to the community. This is not the defendant's first conviction for racketeering conspiracy in connection with the Luchese Crime Family. In 2002 the defendant was convicted of racketeering conspiracy with the same criminal organization and involving some of the same underlying predicate racketeering acts. In that prior case, the defendant was involved in leading a "crew" of the Luchese Crime Family in Bensonhurst, Brooklyn. The defendant's crew engaged in numerous acts of "murder, attempted murder, arson, extortion, loansharking and narcotics trafficking." (PSR ¶ 99). The defendant personally engaged in acts of extortion and illegal gambling, just like he did in this case. (*Id.*) The defendant's history of repeated convictions for racketeering conspiracy in connection with the Luchese Crime Family demonstrates that the defendant, like so many made members of organized crime, views his membership in La Cosa Nostra as a life-long commitment. The defendant's own track record

demonstrates that he is likely to immediately return to committing racketeering crimes upon release, just as he did after his last period of incarceration.

In light of the above, the defendant cannot demonstrate, particularly by the clear and convincing evidence required by the Bail Reform Act, that he would not pose a danger to the safety of the community if released. Accordingly, the defendant's motion for bail pending appeal must be denied.

### IV. THE DEFENDANT'S APPEAL DOES NOT RAISE ANY SUBSTANTIAL QUESTIONS OF LAW OR FACT LIKELY TO RESULT IN REVERSAL OR A NEW TRIAL AS TO ALL COUNTS OF CONVICTION

Even if this Court concluded that the defendant had proven by clear and convincing evidence that he would not pose a danger to the safety of the community, the defendant's release would still not be warranted. As detailed below, none of the four arguments that the defendant asserts on appeal is likely to be meritorious. Because the defendant's appeal does not raise any substantial questions of law or fact likely to result in reversal or a new trial as to all counts of conviction, bail pending appeal should be denied.

#### A. Expert Testimony of Special Agent Carillo

The defendant first argues that expert testimony offered by Special Agent John Carillo, a nationally-recognized expert in La Cosa Nostra, exceeded the permissible bounds of expert testimony. But, as this Court ruled in denying the defendant's motion in limine to exclude the testimony, each of the topics about which Special Agent Carillo testified fall well within the bounds of permissible expert testimony—as the Second Circuit has repeatedly concluded with respect to Carillo specifically.

Pursuant to Federal Rule of Evidence 702, expert testimony is generally admissible if it relates to a specialized area of expertise and will assist the trial of fact to understand the evidence or to determine a fact in issue. *See United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994). The Second Circuit has repeatedly approved of the admission of expert testimony regarding the general terminology, composition, structure, and practices of La Cosa Nostra families in organized crime cases, including the types of crimes commonly committed by La Cosa Nostra—precisely the topics about which the defendant now complains. *See United States v. Matera*, 489 F.3d 115, 121 (2d Cir. 2007); *United States v. Amuso*, 21 F.3d 1251, 1263–64 (2d Cir. 1994); *United States v. Locascio*, 6 F.3d 924, 936 (2d Cir. 1993); *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988). Indeed, the Second Circuit and other judges of this Court have previously ruled on this issue specifically as to Special Agent Carillo that his expert testimony is properly admitted under Rule 702. *See, e.g.*, *United States v. Dey*, 409 Fed. App'x 372 (2d Cir. 2010) (affirming admission of Special Agent Carillo's testimony regarding "the structure, hierarchy, rules, and conduct of organized crime, organized crime terminology and code language, and the functioning of illegal gambling operations"); *United States v. Delligatti*, No. 15 Cr. 491 (KBF), 2018 WL 1033242, at *5 (S.D.N.Y. Feb. 23, 2018) (Forrest, J.) (same); *United States v. Boyle*, No. 08 Cr. 523, 2010 WL 286624 (S.D.N.Y. Jan. 15, 2010) (McMahon, J.) (same). There was no error in this Court's admission of Special Agent Carillo's expert testimony.

The defendant argues that Special Agent Carillo's testimony exceeded the boundaries of permissible law enforcement expert testimony described in *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008). To the contrary, none of the flaws present in *Mejia* were present here. In *Mejia*, the expert was the case agent, who testified directly about specific crimes he had learned the defendant's gang committed, such as that it had killed between 18 and 23 people. *Id.* at 194-97. By contrast, Carillo was not the case agent, and did not testify that the defendant, his crew, or the Luchese Family committed any specific criminal acts. Rather, he explained how the Mafia generally structures the relevant illegal activities, such as illegal gambling, which is an approved subject of expert testimony. *See, e.g.*, *United States v. Dey*, 409 F. App'x 372, 374 (2d Cir. 2010) (affirming that "the functioning of illegal gambling operations" was a proper subject of testimony for an organized crime expert).[1] In *Mejia*, the expert also directly transmitted the substance of out-of-court statements to the jury, for example explaining that he learned from a particular interrogation about MS-13 "taxing" drug dealers. 545 F.3d at 199. By contrast, at no point did Carillo testify about what any out-of-court declarant had told him, instead explaining his own understanding of the Mafia based on numerous sources. Indeed, *Mejia* expressly contrasted the improper testimony in that case with the routine and proper testimony of an expert in La Cosa Nostra. *See Mejia*, 545 F.3d at 189-91.

Moreover, the defendant faces a significant hurdle with respect to this argument in the standard of review that the Second Circuit will adopt. To the extent the defendant argues that this Court erred in denying his motion in limine to exclude Special Agent Carillo's testimony, that decision will be reviewed for abuse of discretion and will not be disturbed on appeal unless "manifestly erroneous." *Mejia*, 545 F.3d at 193. And to the extent the defendant claims that the testimony actually given by Special Agent Carillo exceeded the permissible bounds described above, the defendant's failure to contemporaneously object subjects the argument to plain error review—a demanding standard requiring the defendant to demonstrate error that is plain or obvious, affected his substantial rights, and seriously undermines the fairness, integrity, or public reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732-37 (1993); Fed. R. Crim. P. 52(b). The defendant is unlikely to prevail on this argument.

### B. Limits on Cross-Examination of Cooperating Witness

The defendant next claims that he should have been allowed to cross-examine cooperating witness John Pennisi regarding Pennisi's 1990 manslaughter conviction and an allegation that he committed a "brutal assault" on a woman for sleeping with the defendant. But the defendant's briefing refutes itself. He claims that these incidents show Pennisi's character for jealousy. And Federal Rule of Evidence 404 squarely rejects this argument: "Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in

---

[1] For similar reasons, the defendant's complaint that Carillo "mirrored" and "bolstered" other evidence makes little sense. Experts are allowed to explain the general structure and function of criminal activities such as gambling rings, and of course Carillo testified in general terms about the sort of criminal activity that was at issue in this case. Testimony about other crimes committed by the mob (for example, murder or prostitution) would have been irrelevant and potentially prejudicial to the defendant.

accordance with the character or trait." Fed. R. Evid. 404(a)(1). Put simply, this Court was correct in holding that the defendant could not use a supposed act of jealousy three decades ago to prove that the witness has a propensity to act jealously. And even if the matter had some remote relevance, the Court was fully justified in excluding it under Rule 403 because its probative value was substantially outweighed by the danger of unfair prejudice. This Court correctly determined that a purported act of jealousy in 1989 cannot be offered to show that the witness was more likely to be acting jealously toward a different man and different woman in 2019. The Court also properly allowed the defendant to cross-examine Pennisi on whether Pennisi was hostile to the defendant—which he admitted. The allegation that Pennisi "knocked out the teeth" of a woman who was no part of the case transparently was an attempt to prejudice and distract the jury with inflammatory accusations of unrelated violence. This Court correctly ruled that it had no relevance to witness credibility beyond the impermissible purpose of arguing that the witness had a propensity for jealousy.

Moreover, the defendant will have great difficulty with the standard of review on this issue. The Second Circuit has repeatedly explained that "[a]s long as a defendant's right to confront the witnesses against him is not violated, limitations on cross-examination are not grounds for reversal," *United States v. Roldan-Zapata*, 916 F.2d 795, 806 (2d Cir. 1990), and "[t]he decision of the trial court to restrict cross-examination will not be reversed on appeal unless its broad discretion has been abused," *United States v. Maldonado-Rivera*, 922 F.2d 934, 956 (2d Cir. 1990). Here, the Court not only allowed the defendant to cross-examine Pennisi at length, but allowed him to address the specific parts of the above incidents that were relevant: That Pennisi had lied under oath in 1990, and that he believed the defendant had slept with his girlfriend, giving him an arguable bias-based motive to fabricate. Given that, the Circuit is extremely unlikely to hold that this Court abused its discretion. And even if it does so hold, it will most likely find any such error harmless in light of the other cross-examination on topics that bore more directly on credibility. *See, e.g.*, *United States v. Scarpa*, 913 F.2d 993, 1018 (2d Cir. 1990) ("A trial judge does not abuse his discretion by curtailing cross-examination as long as the jury has sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely in favor of the government." (quotation marks omitted)). This argument is unlikely to result in reversal.

### C. Jury Instructions and Sufficiency of the Evidence

The defendant next argues that the evidence was insufficient and the jury instructions were flawed in a variety of ways. None of the defendant's arguments are meritorious. But to justify bail pending appeal, he must demonstrate a likelihood of reversal as to *all* counts of conviction. His arguments regarding the illegal gambling business (Count One) are most succinctly rejected, so this submission will focus on those issues. Because Count One is not likely to be reversed on these grounds, bail pending appeal is not warranted.

"A defendant challenging a jury instruction as erroneous must show both error and ensuing prejudice . . . viewing the charge as a whole." *United States v. Sabhnani*, 599 F.3d 215, 237 (2d Cir. 2010) (internal quotation marks omitted). The Court of Appeals does "not review a jury charge on the basis of excerpts taken out of context, but in its entirety, to determine whether considered as a whole, the instructions adequately communicated the essential ideas to the jury." *Id.* (internal quotation marks omitted). The defendant argues that the Court erred by failing to

Case 1:18-cr-00015-AKH Document 671 Filed 03/31/20 Page 7 of 11

Page 7

instruct the jury that it had to unanimously agree that at least five people *simultaneously* operated the business *at a particular point in time*. But the defendant cites no Second Circuit case to support his assertion that such a requirement exists. Considered as a whole, this Court's instruction with respect to the gambling business was correct. Indeed, it largely mirrored the language of the statute, *compare* Trial Tr. 816-18 *with* 18 U.S.C. § 1955, and corresponded to instructions given in several other recent trials in this District. The defendant will not be able to meet the demanding plain error standard that will apply on appeal due to the defendant's failure to object to the instruction before this Court.

In any event, even if this Court erred in the jury instructions as the defendant claims, there was no prejudice that affected his substantial rights because the evidence irrefutably demonstrated many points in time at which substantially more than five individuals participated in the business. As the defendant acknowledges, the testimony clearly established that the defendant, the bookmaker Anthony Grecco, and Grecco's principal runner Jerome Riotto were all involved in the gambling business for years. But the defendant ignores all the evidence of the other participants, including most obviously the many recorded phone calls between Grecco and additional participants Gaetano "Tommy" Zuccarello and Theodore "Teddy" Vasilakis over the full multi-year period. (*See, e.g.*, GX 104, 111, 116, 147, 149, 150, 152, 153, 154, 156, 157, 158, 159). The evidence thus conclusively established at least five participants at the same time, without even considering the testimony and exhibits establishing the many other participants (for example, Riotto's testimony that he routinely visited several other participants each week to settle up on behalf of Grecco; (2) the testimony of participant Joseph Anemone; and (3) the intercepted telephone calls establishing that Andre and Carl Mormile, associates of Grecco and the defendant's, helped bring the defendant into the business and thereafter took a portion of the profits). The defendant cannot establish prejudice for any purported error in the jury instructions in this regard, let alone prejudice that affected his substantial rights and seriously undermines the fairness, integrity, or public reputation of judicial proceedings. And, for similar reasons, the defendant's challenge to the sufficiency of the evidence on this point will also fail.

In sum, because the defendant's challenge to his conviction on Count One is unlikely to result in reversal or a new trial as to that count, he cannot meet the requirements for bail pending appeal without even addressing his arguments on Count Three (which are also without merit).

### D. Calculation of Sentencing Guidelines

The defendant finally argues that this Court erred in making certain findings of fact based on the trial evidence when calculating the advisory Sentencing Guidelines, before sentencing the defendant significantly above those Guidelines. This Court need not consider this argument with respect to the question of bail pending appeal, because even if the defendant were to prevail on this argument (and the Government does not believe he will), at most he would be entitled to resentencing based on a lower advisory Guidelines range. It will not result in reversal or a new trial on *any* counts of conviction, let alone on all of them, nor a sentence that is shorter than the time it will take the Second Circuit to resolve his appeal. *See* 18 U.S.C. § 3143(b)(1). This argument cannot serve as the basis for a request for bail pending appeal.

## V. THE COVID-19 PANDEMIC DOES NOT WARRANT THE DEFENDANT'S RELEASE

The defendant's motion also relies on the COVID-19 pandemic in arguing that he should be released. The Government recognizes the seriousness of the public health emergency. But the pandemic has no bearing on the legal framework for bail pending appeal. And even if a mechanism for releasing the defendant existed, the defendant has not demonstrated that release would be warranted due to the coronavirus.

As an initial matter, the argument that the defendant might contract COVID-19 while incarcerated is not a permissible basis for release from custody under the Bail Reform Act. That is because the Bail Reform Act "addresses conditions of release, not conditions of *detention*," *United States v. Valerio*, 9 F. Supp. 3d 283, 293-94 (E.D.N.Y. 2014), and COVID-19 does not have a material bearing on the standards for bail set forth in that statute, *see* 18 U.S.C. § 3143(b). Under the Bail Reform Act, the defendant "shall" be detained unless he satisfies the standards discussed above.

In any event, the BOP generally, and FCI Danbury specifically, are prepared to handle the risks presented by COVID-19 and other health issues. Since at least October 2012, the BOP has had a Pandemic Influenza Plan in place. *See* BOP Health Management Resources, https://www.bop.gov/resources/health_care_mngmt.jsp. Beginning in January 2020, the BOP began to plan specifically for COVID-19 to ensure the health and safety of inmates and BOP personnel. *See* Federal Bureau of Prisons COVID-19 Action Plan, https://www.bop.gov/resources/news/20200313_covid-19.jsp.[2]

As part of its Phase One response to COVID-19, BOP began to study "where the infection was occurring and best practices to mitigate transmission." *Id.* In addition, BOP stood up "an agency task force" to study and coordinate its response to COVID-19, including using "subject-matter experts both internal and external to the agency including guidance and directives from the [World Health Organization (WHO)], the [Centers for Disease Control and Prevention (CDC)], the Office of Personnel Management (OPM), the Department of Justice (DOJ) and the Office of the Vice President. BOP's planning is structured using the Incident Command System (ICS) framework." *Id.*

On March 13, 2020, BOP, after coordination with the Department of Justice, implemented its Phase Two response "in order to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff." *Id.*

---

[2] *See also Module 1: Surveillance and Infection Control*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf; *Module 2: Antiviral Medications and Vaccines*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_2.pdf; *Module 3: Health Care Delivery*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_3.pdf; *Module 4: Care for the Deceased*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_4.pdf.

BOP's national measures are intended to "ensure the continued effective operations of the federal prison system and to ensure that staff remain healthy and available for duty." *Id.* For example, BOP (a) suspended social visits for 30 days (but increased inmates' access to telephone calls); (b) suspended legal visits for 30 days (with case-by-case accommodations); (c) suspended inmates' movement for 30 days (with case-by-case exceptions, *including for medical treatment*); (d) suspended official staff travel for 30 days; (e) suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to only those performing essential services, such as medical treatment; (g) suspended volunteer visits for 30 days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified operations to maximize social distancing and limit group gatherings in [its] facilities." *Id.*

BOP has also implemented screening protocols for both BOP staff and inmates, with staff being subject to "enhanced screening" and inmates being subject to screening managed by its infectious disease management programs. *Id.* As part of BOP's inmate screening process, (i) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (ii) "[a]symptomatic inmates with exposure risk factors are quarantined"; and (iii) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols." *Id.*

The Government has confirmed with officials at FCI Danbury that these protocols have been adopted at that facility. These and other measures were outlined in a March 18, 2020 letter from BOP to Chief Judge McMahon in response to questions regarding the institutional responses to COVID-19 at New York City's federal detention centers—MCC New York and MDC Brooklyn. While not specifically relating to the facility at which the defendant is housed, that letter—a copy of which is attached hereto as Exhibit A—serves as helpful context for the Court regarding the affirmative steps being taken by the BOP to protect its inmates. Furthermore, with respect to the single staff member at FCI Danbury who tested positive for COVID-19, the Government understands that the facility has taken appropriate responsive steps, including medically screening staff members and inmates and sanitizing the facilities are appropriate. Inmates are being appropriately and regularly monitored to identify any who may require medical attention.

In accordance with the above, with limited exceptions for severely ill or immunocompromised defendants, the judges of this District have been rejecting applications for release in the pretrial posture based on assertions about the hypothetical risks of COVID-19, including in cases involving defendants with underlying health conditions, and the standard for release pending appeal is even more restrictive. *See, e.g.*, *United States v. Bradley*, 19 Cr. 632 (S.D.N.Y. Mar. 25, 2020) (Daniels, J.) (denying bail application for inmate detained in MCC on controlled substances and firearm charges who had recently experienced a stroke and had high blood pressure); *United States v. Rivera*, 20 Cr. 6 (S.D.N.Y. Mar. 25, 2020) (Rakoff, J.) (denying bail application for inmate detained in MCC on controlled substance charge who had a childhood history of asthma); *United States v. White*, 19 Cr. 536 (S.D.N.Y. Mar. 25, 2020) (Castel, J.) (denying bail application for inmate detained at Valhalla on controlled substance and Hobbs Act charges with history of whooping cough); *United States v. Alvarez*, 19 Cr. 622 (S.D.N.Y. Mar. 24, 2020) (Cote, J.), ECF No. 17 (denying bail application for inmate detained in MCC on controlled substances charges who had been diagnosed with Hepatitis B); *United States v. Acosta*, 19 Cr. 848

(S.D.N.Y. Mar. 25, 2020), ECF No. 14 (Buchwald, J.) (denying bail application for inmate detained in MCC that "reli[ed] mainly on a form letter proffering general reasons to release inmates because of the spread of the COVID-19 virus).

The defendant's arguments in favor of release due to COVID-19 rely on a number of speculative possibilities regarding the defendant's likelihood of contracting COVID-19 and the likely ramifications should that occur. These arguments should be rejected. The Government has consulted with officials at FCI Danbury, where the defendant is housed. Notwithstanding counsel's "information and belief" statement to the contrary, to date, no inmates have tested positive for the virus in the facility. Nor is it clear that the defendant would be at reduced risk of contracting the virus if he is released from isolation at a facility in rural Connecticut into New York City, the current epicenter of the pandemic in this country.

In any event, the defendant's specific alleged medical circumstances do not warrant his release. The defendant's motion relies principally on the fact that he recently had pneumonia and is now recovered. But the defendant fails to explain why the fact that he previously, *but no longer*, had a respiratory infection requires his release. Nor does he argue why any other health issues, referenced in passing without explanation, relate to increased risk of complication from COVID-19. The Government has confirmed that, in light of his prior pneumonia, the defendant is being routinely medically monitored to ensure no complications or relapses develop. These circumstances do not pose a sufficient threat to his health at FCI Danbury unique from any threat he would face in the general public during the COVID-19 pandemic, much less sets him apart from numerous other inmates with asserted health conditions whose bail applications relying on COVID-19 have been denied, as described above. The defendant instead relies on speculation and generalizations about the facility's ability to address the defendant's health. Such an abstract, boilerplate submission is not a sufficient basis for releasing the defendant.

To be clear, by pointing out the generalized nature of the defendant's claims regarding his health and COVID-19, the Government in no way intends to diminish the significance of the defendant's prior bout of pneumonia or any other medical conditions. Such diagnoses indisputably present health concerns. But the defendant has failed to demonstrate that they entitle him to the extraordinary remedy of release from custody pending appeal. He has not proffered any facts, for example, that allow for a finding by this Court that the medical treatment he claims is necessary would be available to him through home confinement in Staten Island but are not available in federal prison. In short, the defendant's health issues fall far short of being at the level of seriousness necessary to justify the extraordinary remedy that he seeks, even if such a remedy were legally available, which it is not.

## VI. CONCLUSION

For the foregoing reasons, the defendant's motion for bail pending appeal should be denied.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

by: _____
Jacob R. Fiddelman
Hagan Scotten
Assistant United States Attorneys
(212) 637-1024 / 2410

Attachments

cc: Richard Levitt, Esq. (by ECF)